**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

FILED
JUN 30 2011
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| CATHERINE M. OAKLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case Number |
| | )  3:11 cv 424 (REP) |
| THE SCRANTON TIMES | ) |
| d/b/a/ THE PROGRESS INDEX | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Comes now the Plaintiff, Catherine M. Oakley, by counsel, and complains of The Scranton Times d/b/a The Progress Index, as follows:

### Nature of Claims

1) This Complaint arises out of Defendant The Scranton Times d/b/a The Progress Index's termination of Plaintiff Oakley shortly after she had told management that within the next two weeks she would have to take maternity leave and bed rest. Her termination was in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. and the Family and Medical Leave Act of 1993, 20 U.S.C. § 2601, et. seq.

2)      This action is brought under the Family and Medical Leave Act of

1993, 20 U.S.C. § 2601, et. seq. (hereinafter the "FMLA") in that

defendant (hereinafter "The Progress Index") denied the plaintiff

FMLA leave and other rights to which she was entitled under the

FMLA, and terminated and retaliated against plaintiff for exercising

her FMLA rights.

3)      Defendant's actions also constitute unlawful employment practices

arising out of pregnancy and gender discrimination, and retaliation

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

et seq.

4)      Plaintiff seeks declaratory judgment, injunctive relief, compensatory

damages and exemplary damages for defendant's employment

discrimination on the basis of pregnancy and gender, and retaliation

against her for exercising her rights.  Plaintiff claims back pay, lost

benefits, liquidated damages, front pay and/or reinstatement for

FMLA violations, as well as her compensation, damages and other

remedies under Title VII.

## Jurisdiction and Venue

5)    This Court has jurisdiction of the Title VII and FMLA claims herein

pursuant to 28 U.S.C. §§ 1331 and 1343, and pursuant to 29 U.S.C.

§ 2617.

6)    Venue is proper within this District and Division pursuant to

29 U.S.C. § 1391(b) and (c) because the unlawful employment

practices complained of herein occurred, and the employment records

relevant to this matter are maintained and administered, within the

Eastern District of Virginia.

7)    Plaintiff has timely exhausted all required administrative procedures.

Plaintiff filed a timely formal complaint with the Equal Employment

Opportunity Commission (EEOC) on or about June 8, 2010 on her

Title VII claims. The EEOC issued a "Notice of Right to Sue" which

was received by plaintiff on or about April 2, 2011. Suit has been

brought within 90 days of plaintiff's receipt of the "Notice of Right to

Sue," consistent with Title VII of the Civil Rights Act of 1964, as

amended.

## Parties

8)    The plaintiff, Catherine M. Oakley (hereinafter "Oakley") is a female

U.S. citizen and resident of Chesterfield, Virginia. At all times

relevant to the matters alleged herein, she was an eligible employee within the meaning of the FMLA pursuant to 29 U.S.C. § 2611(a) and entitled to the protections of Title VII.

9)    The defendant The Scranton Times d/b/a The Progress Index is part of the Times-Shamrock Newspaper Group of Times-Shamrock Communications, a privately-held, broad-based media company that includes forty-two publications, seventeen radio stations and a distribution company. Defendant's corporate headquarters is in Scranton, Pennsylvania. At all relevant times The Progress Index was, is and has been an employer engaged in an industry affecting commerce with more than one hundred employees for each working day in each of twenty or more calendar weeks in each relevant calendar year. It is an "employer" within the meaning of 29 U.S.C. § 2611 (4)(A) and is subject to the provisions of the FMLA. The Progress Index is also an "employer" as that term is defined in Title VII, 42 U.S.C. 2000e.

## Factual Allegations

10)   (a)    Plaintiff was hired by The Progress Index on October 18, 2000 as an Advertising Sales Representative. At the time of hire Oakley was married and had two children ages 7 and 15 months old. During

4

Oakley's employment as a Sales Representative she was recognized
and welcomed to the Times Shamrock's "Top Performers Club,"
named a Golden Shamrock Winner and recognized as being in the top
4% of the sales force.  Ms. Oakley received awards such as a $1,000
bonus, gold watch, invitation to Owners Summer Cottage and letters
of appreciation.

(b)    Exhibit A hereto shows her receipt of an August, 2009
Certificate of Achievement for Integrity Coaching of her staff.

11)    On October 1, 2007, she was promoted to the position of Advertising
Director.

12)    Oakley enjoyed working for The Progress Index, and her tenure at the
company was successful.  She performed her duties at or above the
level reasonably expected by The Progress Index, and The Progress
Index at times recognized and rewarded her for her successful
performance.

13)    In January, 2006 Oakley told her supervisor, Dennis Wilston, that she
was pregnant.

14)    Dennis Wilston made the suggestion that Oakley and Wilston would
work together to develop a plan that would cover Oakley's sales

territory and accounts while she was on maternity leave under FMLA. The two of them did so.

15) Oakley's performance during this pregnancy remained very successful.

16) Oakley took about eight weeks of maternity/FMLA leave.

17) Throughout her pregnancy leave and immediately after she gave birth, Oakley was able to work from home, and her monthly bonus for 2006 shows that she continued to successfully generate revenues for The Progress Index. Each month during her leave, Oakley reached her budget goals. She returned to work after giving birth on or about August 25, 2006.

18) Plaintiff's immediate supervisor, Dennis Wilston, Advertising Director, resigned from his employment at The Progress Index on or about June 20, 2007. On October 1, 2007 plaintiff was promoted to the position of Advertising Director, reporting to Cindy Morgan, Publisher, The Progress Index.

19) In December of 2007, Oakley learned that she was again pregnant. She notified Cindy Morgan of her pregnancy thereafter in due course.

20) Oakley made The Progress Index aware of her need for medical leave. The Progress Index approved medical leave.

6

21) During a company sponsored Christmas Party in December 2007, plaintiff's husband was approached by Cindy Morgan, who told him that "there will be no more children, right?" Cindy Morgan then walked away. At the time this statement was made by her, Morgan knew that plaintiff was in the first trimester of her pregnancy.

22) During this pregnancy, Cindy Morgan was plaintiff's immediate supervisor. On several occasions Morgan made plaintiff explain and re-explain the dates that the baby was expected, when she would be on leave and when Oakley would be returning to the office. Morgan noted this information in Morgan's calendar during these repeated interrogations. Plaintiff complied and responded each time.

23) Morgan told Oakley during this pregnancy that the expectations on her would be high and Morgan hoped that Oakley could handle them, because it was critical and this pregnancy was just "bad timing."

24) About August 25, 2008 Oakley began her maternity leave. During this pregnancy leave and immediately after birth, Oakley was able to work from home. Oakley managed her department and staff, handled payroll, day to day operations and special publications. She returned to work on or about October 25, 2008.

25) In December of 2009, Oakley learned that she was again pregnant. She immediately notified the Human Resource Director, Peggy Simon, at The Progress Index of her pregnancy.

26) During a conversation concerning Christmas and gifts for Oakley's children, Oakley said that she was getting a Jack Russell Terrier for her oldest son as a Christmas present. Cindy Morgan interrupted and told Oakley that "you need a dog like you need another child." Plaintiff reported this to Human Resource Director Peggy Simon.

27) On January 4, 2010 Oakley stopped by Morgan's office briefly to inform her of the results from a follow-up doctor's appointment. She said that she wanted to let Cindy Morgan know that plaintiff had just found out she was pregnant with twins. Morgan immediately put her hands over her face and screamed, "Catherine, O My God, NO! I thought you had your tubes tied." Morgan laid her head on her desk. Embarrassed by Morgan's reaction, Oakley left to attend a meeting. After the meeting, Oakley was approached by Robert Seals, Circulation Manager and Peggy Simon, Human Resources Director. Seals asked Oakley what she had done to Cindy? Oakley said that she had told Morgan that she was pregnant. Seals and Simon started laughing and told Oakley that after their meeting Morgan had packed

up her belongings and left the office without speaking to anyone or giving directions for her absence. Morgan's normal behavior was to let the department managers know who the point person was and if it were appropriate to contact Morgan during her absence.

28) For a couple of weeks following the January 4. 2010 meeting Morgan avoided Oakley. Morgan's behavior being obvious to Oakley's coworkers, Simon commented to plaintiff that Oakley needed to make up to Morgan so that Morgan would stay out of Simon's office. Plaintiff expressed to Peggy Simon that Morgan's behavior was embarrassing and hurtful.

29) (a)    During this pregnancy Cindy Morgan again made Oakley repeatedly explain the date that the twins were expected, when Oakley would be on leave and when she would be returning to the office. Morgan noted on her calendar this repeated information.

(b)    It was during one of these interrogations that Morgan told plaintiff that the Morgan's expectations of her Advertising Department were mandatory, and that this was going to be a busy year. Morgan asked her if she were capable of handling the expectations. Plaintiff responded that she was capable to manage her duties. Oakley disclosed to Morgan a plan that was put in place to

manage the Advertising Department while Oakley was on maternity leave.

30) Just prior to a Dept. Head Meeting, during a conversation between Peggy Simon and Oakley, concerning how expensive maternity clothes were, Morgan interrupted the conversation and stated that since Oakley was the only one who had that problem they should move on to another topic.

31) On May 4, 2010 during Oakley's periodic doctor's appointment, Oakley was told that between the 26th and 28th week of her pregnancy she would be expected to start bed rest in an effort to prolong the pregnancy for the twins. Oakley explained to her doctor that she was expected to be in Baltimore, Maryland for a corporate meeting on May 10, 2010, and would be returning on the 13th. Her doctor agreed that she could make the required trip, but on her return would begin bed rest. Oakley gave Simon this information over lunch the same day. Morgan was absent that day.

32) Plaintiff was absent the following day, and upon her return on May 6, 2010 received the FMLA papers from Peggy Simon to have filled out by her doctor at her next appointment.

33)    It was also on May 6, 2010 that Lauren Andrews (a member of
       Oakley's staff, and the Digital Sales Rep.) told Oakley and
       Devin Grandison (a member of Oakley's staff and a Classified Sales
       Rep.) that Oakley could not be absent. Andrews said Morgan had
       called Andrews into her office several times on May 5, 2010 and that
       during one of several conversations Morgan had asked Andrews if she
       intended to have any more children. Andrews stated to Oakley and
       Grandison that she thought this was a strange question by Morgan,
       because Morgan was not the "motherly type."

34)    (a)    On May 6, 2010 when Morgan and Oakley had the opportunity
       to speak, Morgan questioned Oakley's ability to make the Baltimore
       corporate trip. Oakley told Morgan of the doctor's orders, and that
       Oakley could make the trip. Morgan told Oakley that she had
       requested for Andrews to join them on the trip to Baltimore, but that
       the owners had declined Morgan's request. It was also for this trip
       that Morgan insisted a slide show presentation be put together by
       Oakley and her staff for the Baltimore trip, which increased Oakley's
       workload unnecessarily. The slide presentation was not allowed to be
       used in the meeting. Morgan had knowledge of this beforehand.

(b)     Oakley reminded Morgan that she was carrying twins and for their health Oakley would be required to go on bed rest.  Oakley advised Morgan that her team was ready and prepared, and again she would be handling most details from her home.  Morgan replied that she would now have to check company policy to see if Oakley would have to use vacation and sick time before the maternity leave would apply.  With her prior two pregnancies at The Progress Index, use of accumulated vacation and sick time were not required by The Progress Index.

35)     (a)     On Saturday May 8, 2010 Morgan called Oakley at home and requested that Oakley meet her at The Progress Index for an emergency.  When Oakley arrived Morgan and Peggy Simon were waiting in Morgan's office.  Morgan told Oakley that she was to listen and that she was not to say a word.  Morgan falsely accused Oakley of failing to institute follow-up training for Boot Camp, and threatened her staff if anyone mentioned this.

(b)     Morgan told Oakley that she was being suspended for "unethically failing to train the staff according to company standards." The suspension was without pay pending an investigation and a complete audit of Oakley's department.  Morgan stated that Oakley

12

would not be attending the conference in Baltimore, and that Andrews would now be attending in her place.  Morgan told Oakley that she was not permitted back on company property, access to email and that she should not speak to any staff members.  Morgan told Oakley that she would be terminated on the Friday, May 14, 2010 upon Morgan's return with Lauren Andrews from Baltimore, and the completion of the investigation.

(c)    Morgan advised Oakley that she could remove her personal items from the office.  Oakley denied Morgan's false accusations and questioned the validity of the suspension and "investigation".
Peggy Simon followed Oakley to her office and then escorted her to the door.

(d)    Prior to this plaintiff had not been disciplined, negatively counseled or written up at The Progress Index, nor had her job security been put in doubt during Plaintiff's employment of almost ten years there.  Although requested by the Virginia Employment Commission to participate in the Commission's fact-finding process concerning plaintiff's employment with defendant, defendant advised the Commission that it declined to do so.

36)    (a)    On May 14. 2010 Oakley met with Bill Nish, Corporate HR
from Scranton, Pennsylvania and Peggy Simon concerning the
suspension and the "investigation." Oakley informed Nish that she
had implemented the Integrity Selling Program and that she had
coached her team in the areas of time management, managing
customer expectations, and presentation writing. Oakley said that she
had not enforced the activity to construct paper hats as this was
beneath the dignity of sales staff, considering their maturity and
abilities. Oakley said that making paper hats was not the best use of
time.

(b)    Nish replied he did not believe that she would be expected to do
such paper hat activity. Nish presented a box at this meeting that was
provided to him by Morgan, supposedly the Integrity Selling Program,
and questioned Oakley's knowledge of what this was. Oakley said
that the box Morgan had provided was at least twelve years old, and
that the current version of the Integrity Selling Program was in a red
envelope in the book case behind Oakley's desk. Oakley complained
to Nish about Morgan's negative treatment of Oakley, as well as the
adverse employment actions described above. Oakley informed Nish
of Peggy Simon's prior knowledge of all the incidents of negative

behavior. The Progress Index retaliated against Oakley for making complaints and terminated Oakley.

37) The Progress Index terminated Oakley on June 8, 2010.

38) On June 10, 2010 Oakley went into premature labor, and remained in the hospital for twenty-three days until her twins were born in an emergency situation eight weeks premature. Oakley's infants remained in the intensive care unit 3½ weeks after her discharge from the hospital.

39) Within a few weeks, The Progress Index replaced her with a male employee who had no experience as an Advertising Director.

40) The Progress Index's decision to replace plaintiff with an inexperienced male employee was made and implemented in willful, blatant and intentional disregard of and in violation of plaintiff's rights under the FMLA and Title VII. Its pretextual decision and "investigation" was also in retaliation for plaintiff's complaints and exercise of her legal rights under FMLA and Title VII.

## COUNT ONE
## FAMILY AND MEDICAL LEAVE ACT OF 1993, 29 U.S.C. §2601

41) Plaintiff incorporates and re-alleges the allegations contained within the preceding paragraphs as if fully set forth herein.

15

42) All of the acts of Cindy Morgan, Publisher and plaintiff's supervisor, and The Progress Index were undertaken in the course of and within the scope of Morgan's employment on behalf of the defendant company, and with the knowledge and approval of The Progress Index.

43) During the almost ten-year term of her employment with The Progress Index, Oakley's job performance met or exceeded The Progress Index's legitimate expectations of her.

44) Oakley's pregnancy for which she would have taken medical leave beginning about April 18, 2010 constituted a serious health condition within the meaning of the FMLA and of which The Progress Index was aware.

45) As a matter of law, Oakley would have been entitled to reinstatement to her position or to a comparable position, in July of 2010 when she would have returned to work as Advertising Director.

46) The acts and practices of the defendant company complained of herein, including the termination of Ms. Oakley's employment prior to her requested medical leave, were willful and retaliatory and interfered with, restrained and denied the exercise or attempt to

exercise plaintiff's rights under the FMLA in violation of 29 U.S.C. §2615(a)(1) and (a)(2).

47) Plaintiff has been damaged by these unlawful actions, including, but not limited to loss of employment; loss of compensation and employment related benefits.

## COUNT TWO
## TITLE VII – GENDER/PREGNANCY DISCRIMINATION

48) Plaintiff incorporates and re-alleges the allegations contained within the preceding paragraphs as if fully set forth herein.

49) Oakley, because of her gender and pregnancy, was denied terms and conditions of employment commensurate with those offered to similarly situated employees who were not pregnant, in violation of Title VII of the Civil Rights Act of 1964, as amended.

50) The Progress Index's discrimination against Ms. Oakley was an intentional or reckless disregard of her rights under Title VII of the Civil Rights Act of 1964, as amended.

51) The Progress Index engaged in its discriminatory and retaliatory actions described above with malice, or with a reckless indifference to plaintiff's legal rights.  Title VII provides that Ms. Oakley is therefore entitled to punitive damages for defendant's actions alleged herein.

52)    Plaintiff has been damaged as a result of The Progress Index's

unlawful conduct.  As a direct and proximate result, plaintiff has

suffered, continues to suffer, and will in the future suffer humiliation,

distress, embarrassment, inconvenience, mental anguish, pain,

suffering, injury and damages, including damage to her reputation and

good will, loss of income, loss of employment, loss of employee

benefits, litigation expense including attorney's fees, and

consequential damages including the loss of employment

opportunities, business and development opportunities, and other

injury.

**WHEREFORE,** plaintiff demands that judgment be entered in her

favor and against the defendant on the above-stated counts, and on each of

them as described above, and that in addition this Court issue an Order:

(i)    Declaring that the acts and practices complained of herein are in

violation of plaintiff's rights as secured by the (a) Family and Medical Leave

Act of 1993, 29 U.S.C. §§ 2615, et. seq.; and (b) Title VII of the 1964 Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq.

(ii)    Requiring and issuing a mandatory injunction directing The

Progress Index to reinstate plaintiff to a position of equal duties and

responsibilities, with equal pay and benefits, as plaintiff would have

received but for the defendant's conduct, retroactive to June 8, 2010 or earlier, or in the alternative for an award of judgment for front pay and benefits under the FMLA and/or Title VII;

(iii)   award plaintiff compensatory damages in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00), plus back pay for violations of Title VII;

(iv)   award plaintiff punitive damages in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) for defendant's willful, malicious, reckless and discriminatory conduct against plaintiff, in violation of Title VII;

(v)   award plaintiff liquidated damages in an amount to be determined at trial for willful violation of the Family Medical Leave Act;

(vi)   award plaintiff an amount sufficient to offset any adverse tax consequences resulting from a lump sum award or an award of other relief in this action because she was required to file suit to enforce her federally protected rights;

(vii)   award plaintiff other appropriate injunctive relief;

(viii)   award plaintiff incidental and consequential damages, attorney's fees for FMLA and Title VII violations by defendant, and costs of this action, including expert witness fees; and in addition,

(ix)   award Oakley such other and further relief as may be

appropriate under the circumstances.

## TRIAL BY JURY IS REQUESTED.

### CATHERINE M. OAKLEY

By_____
                 Of Counsel

Jay J. Levit (VSB #05637)
10132 West Broad Street
Glen Allen, VA 23060
804.270.4600
804.747.5576 - Fax
jaylevit@msn.com

*Counsel for Plaintiff*